Ramos v. Kijakazi is our next case. Good morning, Your Honors, and may it please the Court. We let your adversary find a seat first. Apologies for that. Mr. Farr. Thank you. Good morning, Your Honors, and may it please the Court. I would reframe the issue here to a question of whether, or rather, how much evidence of behavioral abnormality can an ALJ ignore before it becomes harmful error requiring reversal. In this case, Mr. Ramos filed for SSI benefits in May of 2018 in between two hospitalizations for suicide attempts. Later that year, there was some altercation with the police. The account of what exactly happened varied over time. Can you highlight for me what you think the greatest omissions were somehow in the ALJ's consideration? Because whether I would avoid this the same way or not, you have Dr. Brooks, who's evaluating, it seems, all of the testimony. You have the ALJ's awareness that he's got, at best, a spotty work history, pretty unsuccessful work history. The ALJ seems to be aware of the suicidal tendencies. So if you got the redo that you wanted, how would the package of evidence be expanded? I think it would focus more, actually, on the 2020 forward evidence when he's back into treatment because it establishes, for one thing, that his mental health providers, even though he's changed systems over to Indiana, still view him as having serious limitations. I know a global assessment of functioning is not an opinion, but it's still consistent with what the tropical Texas providers have done. And that's when we start seeing more evidence of actual clinical abnormalities in the record, whereas before it's more like these big incidents that happened and then a gap of care for like a year. What about this on-again, off-again compliance with the medications? It seems that he does get better when he is prescribed and stays on the medication, so he never seems to stay on them for too long. So I think there's two parts to that. One, at least my reading of the record, is that he stays consistently having issues with anger management and interpersonal relations, even when his depressive symptoms are more well-maintained. And I think that that was a big issue that I had with Dr. Brooks' testimony, where there wasn't really an acknowledgment of these social limitations, even though there was evidence of this in the record and this weird fixation on cognitive impairment. The other side of this is that I think it's fairly well established that people with severe mental illness, even though noncompliance does have to be considered, they do have difficulty sticking with medication regimens, more so than patients with a physical impairment. That's because they're mentally impaired, right? Exactly, yeah. And so I think that it's not that the judge couldn't, on a new hearing, ultimately say, you know what, there's enough here to say you're not disabled. That could be the ultimate result. But I think that there is enough evidence of these anger issues, and the judge doesn't really discuss it, and Dr. Brooks, who she's relying on, mischaracterizes what was being discussed there. So, yeah, there's those big events in 2018. I think they're important, but really I think it's more the evidence in 2020. When he's in this ongoing consistent treatment, again, he has these issues with compliance. Again, there's a history of substance use. There are definitely factors that the judge could use to say, I'm not going to find you disabled. But I think she needs to discuss the contradictory evidence to her holding as well, and I don't think that she really did that in downplaying the symptoms observed in the treatment sessions to characterize it as, I think it was something like, sometimes he seemed depressed, is basically how she phrased the evidence, to not really discuss the issues with anger or relational difficulties. And I think that forms a stronger bridge to what was happening in 2018. I also think that it's reasonable that the consultants, when they looked at this case, didn't provide as great of limitations, because they were looking at late 2018 and then in 2019. And at that point in time, he'd had these big episodes, he wasn't very consistent on care, even though a lot more care had been recommended, and then he dropped out of care for like a year. So when the consultants are providing these lesser limitations, I think that's pretty well-grounded for them to do so. But the picture, again, had changed by 2020. And I think that, again, is why I keep coming back to 2020. I think that's the most important thing. And again, his depression symptoms maybe are better managed when he's on medication, but he continues to have these issues with his family, with his girlfriend. There's this pattern that I know I'm kind of repeating myself now, but it links back to that 2018 pattern of, well, he's doing something to get in trouble with this police officer, he's engaging with this police officer in kind of a weird way. So can I ask you, I know you were trying to get answers from the vocational expert. And one of the typical questions somebody will pose to a vocational expert is something along the lines of, if he would be out of work, you know, two days a month or three days a month, would that be work-preclusive? Where was that question asked? I apologize. I feel like it was asked somewhere. Yes. The number of days is interesting because, you know, if he has these outbursts of anger where he's shouting and isn't appropriate for the workplace, I can imagine an employer might send him home. And I don't know that I asked about absences. I asked about whether he'd have to tolerate employer interactions. Right. You emphasized that. I mean, you say if he can't interact with humans, then why can he interact with supervisors but not coworkers or other visitors to the workplace? That's clearly there in the record. I think I failed to ask a question about absences, frankly. Okay. It might be in there, but I don't think I did. And normally that would come up, but I also feel like the bigger issue here that I keep emphasizing is these anger episodes. And so I don't necessarily think maybe if he could live in a bubble and not interact with other people, then he could show up to his job every day. And there's also this kind of weird Mr. Ramos only disclosed to me after the hearing, oh, actually, sometimes I work at this hot dog stand. So he's doing some sort of work sometimes to some degree. I don't know how well he's able to stick with a schedule or anything. We weren't able to develop that further. I did update the ALJ to let her know he's disclosed this. So that certainly could be evidence of, well, you can stick to some kind of schedule if you're doing this consistently. And so that might make a problem for something like absences or time off task if he's able to work somewhat. But I do think that when it's based around, well, if the weather's all right and if I'm feeling good enough, then I'll do it, maybe that's suggesting more that a lot of the time he's not really going to be in a place where he can interact with these people regularly or even interact with the guy who actually owns the hot dog stand. So I think that probably answered that question. Yeah, that's fine. I actually think probably I'd rather just reserve the remainder of my time unless there are other questions for me right now. Certainly, Mr. Farr. Okay, thank you. Ms. Spechtelsbauer. Very good. It's a tough one. Good morning, Your Honors, and may it please the Court. Erin Brechtelsbauer on behalf of the Acting Commissioner of Social Security. I'd like to start with where my opponent ended a little bit there. As far as his anger issues and Dr. Brooks' testimony, Dr. Brooks did not mischaracterize Mr. Ramos' anger issues. In fact, he directly confronted them. He noted Mr. Ramos' reports of significant anger issues. He noted Mr. Ramos' encounter with police and the alleged harassment of an officer back in 2018. And as counsel mentioned quite a few times that the more recent evidence, the 2020 treatment, is what he considers the most important because it demonstrates a, quote, pattern that links back to the 2018. To me, that effectively says what we're saying. It's a pattern. It's the same thing that the ALJ considered that the state agency physicians who opined lesser limitations than the ALJ found considered. And Dr. Brooks did consider the 2020 record, all of the medical records he considered. But, you know, aside from in fantasy land, I mean, it's hard for me to imagine Mr. Ramos holding down a regular job. He holds up in his room all day long. He doesn't speak to his father. The only person he speaks to is his mother. He has daily outbursts of inappropriate anger. And there's never really a satisfactory answer to the question why supervisors are different from other people. You know, and if he can't control himself around people, you know, why is it that he can control himself around supervisors well enough to be supervised? That's a great question. And I do think there is an answer to it. As the ALJ discussed, Mr. Ramos mentioned difficulties relating to his girlfriend, difficulties engaging with his parents is in the transcript. That's primarily what he talks about, right, fighting with his parents. He's 23 years old, with all due respect. And he says he spends all his time in his room. Right, to avoid the fights with his parents. So he doesn't want to be with anybody. Right. And, again, he does say he spends his time in his room so that he doesn't reach an argument with his parents. So I would argue that doesn't show. So you're thinking there's a workplace, certainly not the jobs that are identified, a workplace where he's just inside a bubble and never sees anybody? I don't think that's necessary. And I think the ALJ was reasonable in finding that was not necessary, that superficial, occasional interaction with supervisors, the public, and coworkers would be sustainable for Mr. Ramos. What evidence supported that? Mr. Ramos' own statements that he didn't have difficulty interacting with supervisors, that he didn't lose a job because of those things. And, indeed, even his hot dog stand, that's a job where you're constantly working with the public. But we don't know how many hours. We could have been there an hour a day. We could have been there 40 hours a week. That's very unsupported in the record, it seems. I mean, counsel did the right thing to call it to the ALJ's attention, but nobody ever reopens the record for more detail. That is true, Your Honor, though it was sent to the ALJ in a letter from counsel, and so any detail he thought would support his case, it made sense that he would include it. But this is a Step 5 case, right? I'm sorry? Yes, this was a Step 5. So the burden is on the commissioner. I'm sorry? The burden is, therefore, on the commissioner. The burden to produce jobs, Your Honor, is on the commissioner. However, the burden of proving disability is always on the claimant. And if he thought his inability to work regular hours at this hot dog stand or interact with customers at this hot dog stand was something supporting his disability, which those facts probably would have helped support his case, it made sense he would include those. The letter, actually, from counsel, it's at, I believe, record 370. It's essentially saying this might be substantial gainful activity. I don't know. So if you want to look into it for that purpose, here you are. But going back to the evidence supporting a superficial occasional interaction with others, three medical opinions. The only medical opinions in the record from two state agency psychologists who reviewed the majority of the record through 2018 and Dr. Brooks. And that's when he's still suicidal. Yes, he had suicidal ideations pretty consistently throughout the record, and Dr. Brooks discusses it. And both state agency psychologists discussed both his March 2018 hospitalization and his May 2018 hospitalization as well. And the arrest was in those records as well, and Dr. Brooks specifically mentioned the arrest. As far as the 2020 records that counsel indicated are the most important for review on remand, he points to a total of, I believe, four medical appointments and three therapy sessions. The three therapy sessions are on topics that the ALJ discussed, suicidal ideation, difficulties of interaction with others, and the four medical appointments he points to, two of them have one abnormal finding as to his mental status exams, and the rest of the mental status exam is completely normal. And those two, notably, are the later appointments. The first two appointments when he's just reinitiating treatment are when he has more abnormal findings. But to your Honor's point earlier, when he was on his medication, once he reestablished the care, he showed improvement. And so as far as that altering the ALJ's consideration with additional articulation as to those records, I don't see any reason that would, particularly, again, giving Dr. Brooks review those records and opined that he had lesser limitations than the ALJ found. The ALJ, again, assessed the most limiting, the greatest limitations of anyone in the record. And this is not a case where an ALJ kind of skirted things or anything like that. She called not just Dr. Brooks, a testifying psychological expert, she also called a testifying medical expert as to Mr. Amos's potential physical impairments. She went above and beyond to develop the record here to get updated opinions on his functioning given the additional records after the state agency review. So this is not a case where there's more to review. Could the ALJ have been more verbose? Yes, that's essentially always the case. But conciseness is not an error. And here she discussed the lines of evidence that Mr. Amos now points to, and no more was required. The articulation bar is low, and substantial evidence is a very deferential standard. And here, three medical opinions and general consideration of the evidence supporting and undermining disability, we argue, would meet that standard. If the court has no further questions, we would rest on our brief and ask you to affirm. Thank you very much. Thank you, counsel. Anything further, Mr. Carr? Yes, sir. In listening to that response, I think the biggest thing I would emphasize and reply is that Dr. Brooks is not the ALJ. And evidence that he provided to support his decision is one thing. Evidence that the ALJ actually relied upon to reach her final decision is another thing. Dr. Brooks characterized the clinical findings as largely normal. He did cite to things like the hospitalizations, as the opposing counsel just discussed. But he treated the new evidence as a normal record. And that's not consistent with that evidence. Secondly, he could not outline what would cause him to provide social limitations. This was a matter of some dispute in the hearing. I repeatedly tried to get him to clarify, what would you actually need to say that somebody would have these extra social limitations? He said there were other things than cognitive impairment on a mini mental status exam, but he never outlined those things. And given that we're talking about a mental impairment, there's not a lot of objective evidence, depending on how you interpret clinical findings like depressed affect, maybe no objective evidence that can exist. But he was consistently describing these relational issues that suggest greater social limitations, even when his depressive symptoms were better controlled. So the judge had to, in her decision, if she wanted to rely on Dr. Brooks' decision, explain why the issues with his testimony are actually still persuasive enough. How, when he's not consistent with the record, and not really able to fully support how he's reaching the limitations he's provided, how is that actually persuasive opinion? And that actually sounds sort of like a 20 CFR 416.920C issue, where she's not actually maybe properly evaluating the opinion. That's not the specific issue I raised here, though. Her actual decision, then, doesn't even outline all the evidence that, say, Dr. Brooks discussed, doesn't explain fully why she found that opinion persuasive, downplays the argument issues, and suggests it's more general findings of largely normal findings in the record. I don't think that really characterizes the nature of his treatment. Again, if she discusses all these things and still says, you know, actually I find Dr. Brooks to be persuasive here, I believe him, and she says, you know, actually I think this hot dog stand work actually counteracts Ramos's own testimony on the subject, that would be one thing. But I don't think that she can fairly devalue Ramos's testimony in the hearing without actually discussing the underlying consistent treatment notes and the fact that his actual treatment providers, even though they did not offer formal opinion, both indicated global assessment of functioning scores, indicating serious limitations, which is inconsistent with what the consultants and Dr. Brooks said. I see that I'm out of time, so if there are no further questions. Thank you. Thank you, counsel. The case is taken under advisement.